

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| and | ) |
| | ) |
| The STATE OF SOUTH DAKOTA, | )     CASE NO.   16 - 5022 |
| | ) |
| **Plaintiffs**, | ) |
| | ) |
| v. | )     **COMPLAINT** |
| | ) |
| COCA MINES, INC. | ) |
| | ) |
| and | ) |
| | ) |
| THOMAS E. CONGDON, | ) |
| | ) |
| | ) |
| **Defendants**. | ) |

The United States of America, by and through the undersigned attorneys, by authority of

the Attorney General of the United States, and for and at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"), and the State of South Dakota

("State"), by and through the undersigned attorneys, by authority of the Attorney General of the

State of South Dakota, and for and at the request of the Secretary of the South Dakota

Department of Environment and Natural Resources ("DENR"), allege as follows:

## NATURE OF ACTION

1.      This is a civil action brought against CoCa Mines, Inc. ("CoCa Mines") and Mr.

Thomas E. Congdon, Individually, ("Mr. Congdon") pursuant to Section 107 of the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

1

("CERCLA"), as amended, 42 U.S.C. § 9607, for the recovery of costs incurred by the United States and the State in response to the release or threatened release of hazardous substances at and from the Gilt Edge Mine Site (the "Site") in Lawrence County, South Dakota. The United States and the State also seek a declaration of liability against CoCa Mines and Mr. Congdon pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 113(g)(2), that will be binding in future actions to recover further response costs or damages incurred by the United States and the State in connection with the Site.

## JURISDICTION AND VENUE

2.  This court has jurisdiction over this action and the parties hereto, pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b); 28 U.S.C. §§ 1331, 1345 and 1367; and SDCL § 48-7A-106.

3.  Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), and 42 U.S.C. §§ 9607(a) and 9613(b), because the releases or threatened releases of hazardous substances that gave rise to the claim in this action occurred in this district and because the Site is located in this district.

## DEFENDANTS

4.  CoCa Mines, Inc. ("CoCa Mines") is a corporation organized under the laws of Colorado in 1982, with business conducted in South Dakota.

5.  CoCa Mines is a "person" as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

6.  CoCa Mines is an "owner or operator" as that term is defined in Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

7.  CoCa Mines, the successor to Congdon & Carey Ltd. 5, is liable as an owner and

2

operator of the Site at the time of disposal of hazardous substances within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

8.     Thomas E. Congdon ("Mr. Congdon") is the former President and Chief Executive Officer of CoCa Mines, and a resident of the State of Colorado.

9.     Mr. Congdon is a "person" as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

10.    Mr. Congdon is an "owner" as that term is defined in Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

11.    Mr. Congdon is liable as an owner of the Site at the time of disposal of hazardous substances within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

## GENERAL ALLEGATIONS

### Site Description And Background

12.    The Site is an abandoned gold and silver mine located in the northern Black Hills of South Dakota, about five miles east of Lead, South Dakota. The Site is located at the headwaters of the drainage that contains regional aquifers used as private and municipal water sources.

13.    Mining operations for gold and silver were conducted at the Site starting in 1876. Early-to-mid 20th century, a series of small mines began dumping metals-laden tailings into Strawberry Creek, contaminating these waters and those further downstream in Bear Butte Creek. Bear Butte Creek is designated by the State as a coldwater fishery and limited-contact recreation water.

14.    Since operations began, mining and mineral processing have been conducted at the Site by a number of owners and operators, including private individuals as well as

companies.

15.     The Site is heavily contaminated as a result of these historic mining activities. Water at the Site contains hazardous substances including arsenic, cadmium, chromium, copper, lead, manganese, nickel, and zinc. Hundreds of millions of gallons of this acidic, metals-laden water has been treated at the Site and requires on-going treatment. Millions of cubic yards of acid-generating waste rock have been remediated at the Site.

**Defendants' Relationship To The Site**

16.     In 1974, Mr. Congdon, Individually, signed a lease with Commonwealth Mining Company ("Commonwealth Lease") to mine roughly 1,352 acres at the Site comprising at the time 76 patented lodes, 1 patented placer, and 18 unpatented lodes.

17.     In 1974, Mr. Congdon and Mr. William J. Carey formed Congdon & Carey Ltd. 5, a limited partnership that owned property interests and, with another company, operated an extensive exploration and mine development program at the Site.

18.     In 1975, Congdon & Carey Ltd. 5 and Cyprus Mines Corporation created a Joint Venture Agreement ("Agreement"), the purpose of which was to finance and perform exploration and mine-development work at the Site.

19.     In 1976, Congdon & Carey Ltd. 5 signed a lease agreement with Northwestern Metals Company ("Northwestern Lease") to mine roughly 119 acres at the Site comprising at the time 16 patented lodes. The Northwestern Lease was subsequently amended to add an additional four patented lodes to the original 16 patented lodes.

20.     Combined, the Commonwealth Lease and Northwestern Lease covered the largest portion of property at the Site, and allowed Congdon & Carey Ltd. 5 and Cyprus Mines Corporation to perform exploration and mine-development work at the Site.

4

21.     Pursuant to the terms of the Agreement, Cyprus Mines was the day-to-day operator at the Site. Congdon & Carey Ltd. 5, later CoCa Mines, also operated at the Site.

22.     The Agreement required that Congdon & Carey Ltd. 5 pay for 20 percent of the costs of operations at the Site. Congdon & Carey Ltd. 5 paid its share of expenses, and also approved of large expenditures and the types of operations to be conducted at the Site.

23.     Congdon & Carey Ltd. 5 was involved in decisions about the type of testing to be conducted on the ore. In 1977, Congdon & Carey Ltd. 5 sent a letter to Cyprus Mines which stated that, "since the evidence indicates that the gold is held within the pyrite in the sulfide zone, that an attempt be made by flotation or heavy media to make a simple pyrite concentrate" that could possibly be sold to nearby Homestake Mine, which had excess mill capacity.

24.     That same year, Congdon & Carey Ltd. 5 requested that Cyprus Mines include tungsten assays of the core samples that already were being tested for gold. Cyprus Mines did so, and reported its findings in a memo, which questioned the economics of trying to recover the tungsten mineral identified in the samples.

25.     Congdon & Carey Ltd. 5 advised Cyprus Mines on the planned cyanide heap leach facility. In 1979, Congdon & Carey Ltd. 5 sent a letter to Cyprus Mines setting forth a proposal to use nearby Homestake Mine to process Gilt Edge ore, rather than the planned cyanide heap leach facility, which had yet to be built. The letter cited concerns about the location at the Site of the cyanide heap leach facility, "[s]ince the area is subject to flash floods, containment will be difficult, and approval of an [Environmental Impact Study] more difficult."

26.     In 1980, Congdon & Carey Ltd. 5 requested that Cyprus Mines conduct assay tests for iron, copper, zinc and lead on a pyrite concentrate previously obtained from flotation tests.

5

27.     In 1980, operations at the Site included two new adits that were excavated – the Laron Adit and the New King Tunnel, which intercepted the existing King Tunnel. In addition, 17 bulk samples totaling 135 tons from the Rattlesnake Tunnel, King Tunnel, and the Laron Adit were obtained for testing.

28.     In 1980, a cyanide heap leach facility on a portion of the Northwestern Lease was constructed measuring approximately 60 feet by 70 feet at its base, and 12 feet high. About 1700 tons of material blasted from an area adjacent to the Sunday Pit was leached with cyanide at this heap leach facility.

29.     In 1982, approximately 2,000 gallons of water containing cyanide overflowed from the lower holding ponds of the cyanide heap leach facility. This unauthorized disposal occurred on properties covered by the Northwestern Lease, and eventually flowed into Strawberry Creek.

30.     From 1975 to 1982, operations at the Site included collection of hundreds of surface and tailings samples for testing, collection of 1,180 pounds of mine ore samples for testing, and collection of 21 (1-ton) samples (or 42,000 pounds of rock) from various locations at the Site, including underground, for testing. During this time, 61 diamond drill holes totaling at approximately 55,000 feet and 215 rotary drill holes totaling 52,271 feet were completed at the Site.

31.     In 1980, CoCa Mines, Inc. was incorporated in Delaware.

32.     In 1982, Congdon & Carey Ltd. 5, CoCa Mines, Inc. (a Delaware Corporation), St. Mary Parish Land Company (a Delaware corporation), and CoCa Mines, Inc. (a Colorado corporation) filed an Agreement and Plan of Reorganization, with CoCa Mines, Inc. (a Colorado corporation) as the surviving entity. Through this agreement, Congdon & Carey Ltd. 5

6

transferred its assets, including the Northwestern Lease, among others, to CoCa Mines, and CoCa Mines, through the law of merger, assumed all of Congdon & Carey Ltd. 5's liabilities.

33.     In 1982, Congdon & Carey Ltd. 5 became CoCa Mines, Inc.

34.     In 1983, Mr. Congdon quitclaimed his Individual ownership of the Commonwealth Lease to his company, CoCa Mines. CoCa Mines then became the owner of the Commonwealth Lease by virtue of the quitclaim of the leasehold rights.

35.     In 1983, Lacana Mining Company ("Lacana") acquired from Cyprus Mines and CoCa Mines the rights to mine at the Site. Lacana paid these two companies $50,000 for the assignment of their mining leasehold properties, an advance royalty of $200,000, and a 7.5 percent royalty on future production in the deal.

36.     From 1983 through 1986, Lacana continued the mine exploration and development work at the Site, including additional drilling and bulk sampling. In 1986, Lacana recruited Brohm Mining Company to take its place and start large-scale mining operations at the Site.

37.     In 1985, CoCa Mines was a party to an agreement ("1985 Agreement") to remediate "previously mined waste dumps and tailings" on properties covered by the Commonwealth Lease. Specifically, the 1985 Agreement authorized Lacana to use these historic tailings for such projects as "roadway construction, leach pad base, leach pad linings, etc."

38.     The 1985 Agreement was the response to the problem of ongoing disposal of hazardous substances from these historic tailings, well documented at the time. Signed by CoCa Mines, Cyprus Mines, Lacana, and Commonwealth Mining Company, the 1985 Agreement authorized and directed the use of the mined waste dumps and tailings "for construction materials while clearing up potential environmental hazards."

7

39.     While CoCa Mines did not itself move the tailings, it did authorize and direct

Lacana to do so through the 1985 Agreement. And Lacana did. Having taken over the day-to-

day operations from Cyprus Mines, Lacana used the historic tailings to help prepare the Site for

large-scale operations in 1985 and 1986.

40.     In 1986, Cyprus Mines and CoCa Mines sold their ownership interests in the

mining leasehold properties to Brohm Resources, Inc. for $1.25 million. Brohm Resources, Inc.

created Brohm Mining Company, which conducted large-scale mining operations at the Site,

including conducting open-pit mining, creating the Ruby Waste Rock Dump and constructing the

37-acre cyanide heap leach pad. Brohm abandoned the Site in 1999 and is no longer in

existence.

41.     From 1975 to 1985, Cyprus Mines, Congdon & Carey Ltd. 5 (later CoCa Mines),

and Lacana drilled 120,560 feet of core and rotary drill holes at the Site. During this same

period, these parties conducted additional underground mine development work including the

Dakota Maid Decline (mid-1970s), the One John Adit (1979), New King Tunnel (1980), the

Laron Tunnel (1980), and the Rattlesnake Tunnel (1984). From 1978 to 1980, Cyprus Mines and

Congdon & Carey Ltd. 5 conducted bulk sampling ranging from 60 lbs. to 6,000,000 lbs. at the

Site.

42.     Operations conducted by Cyprus Mines and Congdon & Carey Ltd. 5 (later CoCa

Mines) caused the disposal of hazardous substances at the Site. These operations included

drilling holes into the surface and blasting rock for sampling, exposing sulfide-bearing rocks to

air and water, and creating Acid Rock Drainage ("ARD").

43.     The majority of these operations, which caused the disposal of hazardous

substances at the Site, were conducted on the Commonwealth Lease, which was owned by Mr.

8

Congdon, Individually, from 1974 to 1983. These operations also were conducted on the Northwestern Lease, which was owned by Congdon & Carey Ltd. 5 (later CoCa Mines) from 1976 to 1986, and these operations also caused the disposal of hazardous substances at the Site.

44.     In 1986, CoCa Mines merged with and into MECO, a Colorado corporation, and MECO then changed its name to CoCa Mines, Inc.

45.     In February 1991, Hecla Limited (f/k/a Hecla Mining Company) acquired CoCa Mines as a wholly-owned subsidiary through merger. CoCa Mines is no longer an operational company. Hecla Limited remains CoCa Mines' parent company.

## EPA Response Action

46.     Sections 104(a) and (b), 42 U.S.C. §§ 9604(a) and (b), authorize the President to determine the existence and extent of the release or threatened release of hazardous substances, pollutants or contaminants; take action to remove or remedy such releases in order to protect the public health or welfare or the environment; and to recover the costs of these actions.

47.     Mining activities at the Site have caused the release of hazardous substances into the environment within the meaning of Sections 101(8), (14), and (22), and 107(a) of CERCLA, 42 U.S.C. § 9601(8),(14), and (22), and 9607(a).

48.     Acid Rock Drainage at the Site contains hazardous substances including arsenic, cadmium, chromium, copper, lead, manganese, nickel, and zinc, which are "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14). EPA regulations list these substances as hazardous at 40 C.F.R. § 302.4(a) and Table 302.4.

49.     Hazardous substances from mining activities at the Site were disposed of within the meaning of Section 101(29) of CERCLA, 42 U.S.C. § 9601(29).

50.     The State began response actions at the Site in July 1999 with emergency water

9

management and acid water treatment. The State was responsible for the entire Site and all water treatment for 13 months prior to the EPA Region 8 Emergency Response Program assuming water treatment operations in August 2000.

51.     In 2000, the Governor of the State of South Dakota requested that EPA propose the Site for the National Priorities List ("NPL"). In December 2000, EPA placed the Site on the National Priorities List ("NPL") pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and as set forth at 40 C.F.R. Part 300, Appendix B. See 65 Fed. Reg. 75179 (Dec. 1, 2000).

52.     From 2000 through 2002, EPA investigated the Site and developed plans for its cleanup. Because of the large scale of the contamination, as well as the need for ongoing treatment of hundreds of millions of gallons of metals-laden water, EPA and DENR decided to divide the Site into three Operable Units ("OUs"), each addressing a distinct area of cleanup.

53.     Operable Unit 1 ("OU1") addresses surface contamination including three open pits, heap leach pad material, and other mine wastes around the Site. In September 2014, an Explanation of Significant Differences ("ESD") to OU1 was issued. The ESD documents changes from the remedy described in the OU1 Record of Decision, which were determined in the design process to be necessary to reduce the amount of acid-rock drainage that is generated at the Site.

54.     Operable Unit 2 ("OU2") addresses management of ARD generated at the Site, including ARD collection systems, pumping stations, pipelines, water treatment, and management of ARD treatment sludge generated in the future. OU2 also addresses groundwater contamination associated with the Site, and contaminant sources, surface water, and sediments in the Lower Strawberry Creek area.

55.     In 2001, EPA implemented an interim water treatment remedy involving the

10

diversion of ARD from various seeps and mine pits, and the conversion of the existing water treatment plant to a lime precipitation system. Conversion was completed in 2003, and water treatment activities are ongoing. Contaminated water is collected at various facilities at the Site and stored until it is treated and discharged into Strawberry Creek. In addition, EPA has constructed several water diversion structures to keep uncontaminated water run-on from entering the water treatment conveyance system. The final remedial design for OU2 will provide for the study, design and implementation of an upgraded water treatment system for the Site.

56.     Operable Unit 3 ("OU3") addresses acid rock drainage coming from the Ruby Gulch Waste Rock Repository, constructed as part of the remedy to hold waste rock and spent ore at the Site. Acid rock drainage generated from the sulfide-bearing wastes within the dump, if not reduced and contained, poses a threat of releases of hazardous substances into the Ruby Gulch drainage and Bear Butte Creek. Beginning in 2001, EPA addressed this threat by reducing the volume of contaminated materials exposed, reducing water infiltration that produced large quantities of acid rock drainage, and containing waste materials. EPA constructed a cap for the Ruby Gulch Waste Rock Repository that included a drainage system, a synthetic liner and clean soil cover on this portion of the Site.

57.     EPA has incurred response costs of more than $118 million plus interest, conducting response activities at or in connection with the Site, including but not limited to, remedial investigation and design, the remedial actions, investigations of potentially responsible parties, and indirect costs.

58.     Pursuant to Section 104(c) of CERCLA, 42 U.S.C. § 9604(c), the State has incurred response costs related to the Site of more than $6.1 million.

## CLAIM FOR RELIEF

11

**(Joint and Several Liability for CERCLA Response Costs)**

59.     The allegations contained in paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

60.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, inter alia, that the following persons shall be liable under CERCLA for the costs incurred by the United States and the State in responding to the releases or threatened releases of hazardous substances: (1) the owner and operator of a vessel or a facility, [and] (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.

61.     The Gilt Edge Mine Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

62.     Condon & Carey Ltd. 5 is liable as an owner and operator at the Site during the time hazardous substances were disposed of at or on the Site, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

63.     CoCa Mines is the successor to Congdon & Carey Ltd. 5, which is liable as an owner and operator at the Site during the time hazardous substances were disposed of at or on the Site, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

64.     CoCa Mines also is liable as an owner and operator at the Site during the time hazardous substances were disposed of at or on the Site, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

65.     Mr. Thomas E. Congdon, Individually, is liable as an owner at the Site from 1974 to 1983 during the time hazardous substances were disposed of at or on the Site, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

66. There have been and continue to be "release[s]" of hazardous substances at or from the Site, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

67. The actions taken by the EPA and DENR in connection with the Site constitute "response" actions within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25). As a result of EPA's and DENR's response actions, the United States and the State have incurred unreimbursed response costs, as defined in Sections 101(25) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(25), 9607(a).

68. Such costs include the costs of all activities taken at the Site pursuant to Section 104(b) and (e) of CERCLA, 42 U.S.C. § 9604(b) and (e), including but not limited to the costs of performance of remedial actions selected for the Site, together with prejudgment interest, as provided for by Section 107 of CERCLA, 42 U.S.C. § 9607. These costs also include enforcement costs incurred and to be incurred in connection with the Plaintiffs' efforts to recover its response costs from liable parties.

69. Pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, responsible parties are liable for "all costs of removal or remedial action incurred by the United States Government or a State . . . not inconsistent with the national contingency plan [40 C.F.R. Part 300]." 42 U.S.C. § 9607(a)(4)(A).

70. The response actions taken by EPA and the State with respect to the Gilt Edge Mine Site and the costs incurred in connection with those response actions are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

71. Pursuant to Sections 107(a)(2) and 113(g)(2) of CERCLA, 42 U.S.C. §§ 9607(a)(2) and 9613(g)(2), the Defendants are jointly and severally liable to the Plaintiffs for all unreimbursed costs, including administrative, investigative, and enforcement costs that the

13

United States and the State have incurred, are incurring, or will incur in connection with the response actions taken at the Site.

## PRAYER FOR RELIEF

WHEREFORE, the United States and State pray that this Court:

A.      Enter judgment jointly and severally in favor of the Plaintiffs and against the Defendants pursuant to Section 107(a)(2), 42 U.S.C. § 9607(a)(2), for response costs the Plaintiffs have incurred in connection with response actions relating to the Gilt Edge Mine Site, including prejudgment interest on those sums;

B.      Enter a declaratory judgment jointly and severally against the Defendants pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), as to their liability for response costs that will be binding in any subsequent action or actions by the Plaintiffs against the Defendants to recover any further response costs related to the Gilt Edge Mine Site;

C.      Award the United States and the State their costs and expenses for this action;

D.      Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

HEIDI K. HOFFMAN
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
999 18th Street, Suite 370 South Terrace
Denver, Colorado 80202
(303) 844-1392

14

RANDOLPH J. SEILER
Acting United States Attorney
District of South Dakota

DIANA RYAN
Assistant Attorney General
State of South Dakota
325 South First Avenue, Suite 300
Sioux Falls, South Dakota 57104
(605) 357-2340


MARTY J. JACKLEY
Attorney General
State of South Dakota


RICHARD M. WILLIAMS
Deputy Attorney General
State of South Dakota
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
(605) 773-3215